354 So.2d 235 (1978)
TRANSCONTINENTAL DRILLING CO., INC.
v.
DAVIS OIL COMPANY.
No. 8742.
Court of Appeal of Louisiana, Fourth Circuit.
January 11, 1978.
Moloney, Nolan, North, Riess & Hall, Bruce A. North, New Orleans, for plaintiff-appellant.
Liskow & Lewis, Stephen T. Victory, New Orleans, for defendant-appellee.
Before GULOTTA, BEER and BOWES, JJ.
*236 BOWES, Judge.
By a contract dated December 16, 1975, appellant, Transcontinental Drilling Co., Inc. (hereafter, Transcontinental), agreed to provide to appellee, Davis Oil Company (hereafter, Davis), a rig for drilling of a well known as Fleming No. 1, in Jefferson Parish. Transcontinental agreed that drilling by the rig would commence as soon as the rig became available, which was upon completion of drilling another well for Exxon. The contract further provided for a standby time rate of $5,800 per day, and defined standby time as follows:
"4.5 Standby time shall be defined as the time when the rig is shut down although in readiness to begin or resume operations but Contractor (Transcontinental) is waiting on orders of Owner (Davis) or on materials, services or other items to be furnished by Owner."
According to appellant's petition, the drilling rig was made available to Davis on or about December 29, 1975. Davis, being unable to commence drilling at that date, requested that the rig be placed on standby and that Transcontinental find an interim well on which to use the rig. It is further alleged that on January 25, 1976, after termination of an interim job, Transcontinental again offered the rig to Davis, and it was again placed on standby. Davis was billed for standby time, and on March 19, 1976, Davis notified Transcontinental in writing that it was not liable for standby charges. Then, on April 23, 1976, Davis notified Transcontinental that it would not drill Fleming No. 1.
As a result of these events, Transcontinental claims standby charges from December 29, 1975 through April 23, 1976, in the amount of $673,041.67, subject to a credit of $151,606.49, for revenues received from interim employment. It further claims $6,485.20 for incidental expenses, $116,000 in damages for breach of contract, and interest on all charges due at 1½% Per month after 30 days, as stipulated by contract.
There is serious disagreement between the parties as to the facts of the case. Appellee Davis contends that, because of difficulties in financing the drilling of Fleming No. 1, it notified Transcontinental of its inability to use the rig as early as December 26, 1975, and indicated that, if able to drill at a later date, it would attempt to use the appellant's rig. Appellee contends that at no time did it order the rig to be placed on standby, nor did it know such charges were being made until receipt of an invoice on February 6, 1976. On February 10, 1976, Davis' representative, Robert McKnight, verbally advised Lee Matherne, Transcontinental's president, that Davis would not be responsible for such charges. After receiving continued invoices, Davis gave written notification to the same effect to Transcontinental on March 17, 1976. The billing continued until April 23, 1976, when the attorney for Davis advised appellant by letter that Davis had previously ordered work stoppage as contemplated by Article 6.1 and 6.3(a) of the contract.[1]
Pursuant to terms of the contract, the parties' rights thereunder were submitted for arbitration before a panel of the American Arbitration Association composed of *237 Henry J. Dauterive, Jr., Donald W. Doyle, and Fred W. Bates. A written judgment awarding $17,490 in favor of Transcontinental was granted without written reasons, and a request by appellant for a written opinion was denied.
It is appellant's position that absence of written reasons renders the award imperfect in form, and, in effect, denies Transcontinental information necessary to exercise its limited right of appeal under the Louisiana Arbitration Law, LSA-R.S. 9:4201, et seq. It further alleges that, because of its awarding $17,490 where a claim of over $600,000 was submitted, the judgment contains a gross miscalculation of figures.
Thus, it requests that this court either, in effect vacate the judgment and require a hearing on damages, or alternatively, hold open the determination of whether a modification of judgment is warranted and order the American Arbitration Association to provide written reasons for its award.
It is clear that under the Louisiana Arbitration Law, LSA-R.S. 9:4201 et seq., a reviewing court may not substitute its own judgment for that of the arbitrators, Housing Authority of New Orleans v. Henry Ericsson Co., 197 La. 732, 2 So.2d 195 (1941); Greer v. Lowe, 94 So.2d 560 (La.App., 2nd Cir. 1957). The statute severely restricts the circumstances in which a reviewing court may vacate or modify an arbitration award. As stated in Macaluso v. Watson, 171 So.2d 755, 758 (La.App., 4th Cir. 1965):
". . . This authority to vacate, modify, or correct the award is limited in Sections 4210 and 4211 to cases involving fraud, corruption, prejudicial misconduct, excess of authority, error of description, miscalculation of figures, etc., and the right of appeal is also limited to the order of confirmation, modification, correction, or vacation. These sections clearly limit the function of the court and deprive it of jurisdiction of the basic legal and factual question of liability as well as quantum. (footnote omitted)"
None of the grounds listed in Section 4210 as prerequisites for vacating a judgment and ordering a rehearing (Corruption, fraud, undue means, partiality, misconduct in the proceedings, or failure to render a definite award) are alleged. Therefore, a rehearing is not warranted.
Appellant seems to base his argument for ordering the arbitrators to issue an opinion and, thereafter, modify the award, on Section 4211(A) and (C), which provides:
"In any of the following cases the court in and for the parish wherein the award was made shall issue an order modifying or correcting the award upon the application of any party to the arbitration.
A. Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.
. . . . . .
C. Where the award is imperfect in matter of form not affecting the merits of the controversy.
The order shall modify and correct the award so as to effect the intent thereof and promote justice between the parties." LSA-R.S. 9:4211(A) and (C).
Prior Louisiana jurisprudence has dealt neither with the question of the necessity of written findings of fact in an arbitration award, nor with the prerequisites for finding a manifest miscalculation of figures.
Regarding the necessity of a written opinion, 6 C.J.S. Arbitration § 100 (1975) states the following:
"As a general rule, an arbitration award must contain the actual decision which results from the arbitrators' consideration of the matter submitted t them, but arbitrators need not write opinions with as great specificity as a court of law. Unless otherwise provided by statute or by the submission itself, arbitrators are not required to state in the award each matter considered, or to set out the evidence, or to make findings of fact or conclusions of law. They need not give reasons for their award or conclusions or the grounds which form the basis *238 for the arbitrators' determination, describe the process by which they arrived at their decision, or spell out the rationale of the award. (footnotes omitted)" 6 C.J.S. Arbitration § 100.
There is no statutory requirement in Louisiana that written reasons for an arbitration award be rendered. Thus, failure to issue written reasons for judgment cannot be considered an imperfection in the form of the award. It must be assumed that the parties to the arbitration agreement were aware of the procedural rules governing arbitration. Appellant's argument that the arbitrators' refusal to issue written findings of fact effectively denied them the right of judicial review addresses itself to the legislature rather than to the courts.
Appellant's other contention that no possible combination of its claims adds up to $17,490 and, therefore, there is an evident material miscalculation, also lacks merit. Obviously, any possible miscalculation of figures cannot be evident in an award wherein damages were not itemized. The law applicable in such a case is stated in 6 C.J.S. Arbitration § 168 (1975), as follows:
"Also, the court may correct an award where there has been an evident miscalculation of figures, of such character as not to affect the merits of the controversy on matters submitted; but the court will deny such relief if the miscalculation is suppositional and not evident." (footnotes omitted).
It was conceded at appellate hearings that the arbitration proceedings had been recorded by a court reporter, but, because of the expense of transcribing such a voluminous record, it had been agreed that no transcript would be put into the record on appeal. Had a transcript been introduced, it is possible that a miscalculation of figures might have been evident. However, on the basis of the record sans transcript, the alleged miscalculation is purely suppositional. An explanation for the quantum of the award which is more plausible than miscalculation of figures is that the arbitrators, faced with both sides of the case, found $17,490 to be an equitable award.
Finding no reason to alter the arbitration award, we affirm the district court's confirmation thereof.
AFFIRMED.
NOTES
[1] Those provisions read as follows:

"6.1 OWNER'S RIGHT: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, the Owner shall have the right to direct the stoppage of the work to be performed by the Contractor hereunder at any time prior to reaching the specified depth, and even though Contractor has made no default hereunder, and in such event Owner shall be under no obligation to Contractor except as set forth in subparagraph 6.3 hereof."
"6.3(a) If such work stoppage occurs prior to the spudding of the well, Owner shall pay to Contractor the sum of the following: (1) all expenses reasonably and necessarily incurred and to be incurred by Contractor by reason of the contract and by reason of the premature stoppage of the work, excluding, however, expenses of normal drilling crew and supervision; (2) ten percent (10%) of the amount of such reimbursable expenses; and (3) a sum calculated at the standby rate for all time from the date upon which Contractor commences any operations hereunder down to such date subsequent to the date of work stoppage as will afford Contractor reasonable time to dismantle his rig and equipment."